TIMOTHY A. BARNES, Judge.
Before the court is Trustee Marilyn O. Marshall's Objection to Confirmation [Dkt.
*197 No. 37] (the "Objection") brought by the chapter 13 trustee (the "Chapter 13 Trustee") in opposition to an amended Chapter 13 Plan dated February 13, 2018 [Dkt. No. 31] (the "Plan") presented by Larry Shelton, the debtor in the above-captioned case (the "Debtor").
The Chapter 13 Trustee objects to the Plan insofar as it is structured to provide payments to a secured creditor beginning as minimal, adequate protection payments and thereafter stepping up those payments to a more fulsome amount-a so-called "step" plan. Here, the increase in payments occurs when payments to the Debtor's counsel, The Semrad Law Firm, LLC ("Semrad"), are scheduled to be complete. The Chapter 13 Trustee alleges that such a payment structure violates the express requirements of chapter 13 plans, exists solely to benefit Semrad and is proposed in bad faith.
For the reasons more fully stated below, the court agrees. The Objection will be sustained and confirmation of the Plan denied.
JURISDICTION
The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).
A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or sua sponte , whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the court may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1) & (c). Instead, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).
In addition to the foregoing considerations, a bankruptcy judge must also have constitutional authority to hear and determine a matter. Stern v. Marshall, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or where the matter is either one that falls within the public rights exception, id. , or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter. See, e.g. , Wellness Int'l Network, Ltd. v. Sharif , --- U.S. ----, 135 S.Ct. 1932, 1939, 191 L.Ed.2d 911 (2015) (parties may consent to a bankruptcy court's jurisdiction);
*198 Richer v. Morehead , 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").
Matters involving confirmation of a debtor's chapter 13 plan may only arise in a bankruptcy case, concern the administration of the bankruptcy estate and are, thus, within the court's core jurisdiction. 28 U.S.C. § 157(b)(2)(A), (L) ; In re Williams , 583 B.R. 453, 455 (Bankr. N.D. Ill. 2018) (Hunt, J.) ("Matters relating to confirmation of a plan are core proceedings under 28 U.S.C. § 157(b)(2)(L)."). The matter is therefore core and within the court's jurisdiction. The Debtor has submitted itself to this core jurisdiction and authority by bringing the above-captioned case.
As a result, this court has jurisdiction, statutory authority and constitutional authority to hear and determine this matter.
PROCEDURAL HISTORY
In considering the Objection, the court has considered the Plan, the prior plans presented by the Debtor, National Form B113 (the "National Plan") upon which each plan was based[1] and the Debtor's Response to Trustee's Objection to Confirmation [Dkt. No. 45] (the "Response").
On December 7, 2017, the Debtor presented its original Chapter 13 Plan [Dkt. No. 13] (the "Original Plan").[2] The Original Plan contained a provision with an effect similar to the one at issue in the Plan, though with substantially different language used to obtain that effect. See Original Plan § 8.1.
On January 25, 2018, the court conducted the first of four confirmation hearings in this matter (collectively, the "Hearings"), at the time considering the Original Plan. Early in the Hearings, the Chapter 13 Trustee voiced concerns over nonstandard provisions in the Debtor's plans. While the Debtor revised the Original Plan when filing the Plan at issue here, the problematic effect of the nonstandard provisions remains unchanged.
Early in this case Semrad, the Chapter 13 Trustee and the court were also actively engaged in a similar matter, wherein Semrad and other chapter 13 debtors' counsel attempted to change the priority scheme in chapter 13 plans to permit counsel to be paid ahead of other creditors. See In re Gilliam , 582 B.R. 459, 470-75 (Bankr. N.D. Ill. 2018) (Barnes, J.). Because objections to plans must be in writing, see Fed. R. Bankr. P. 3015(f), and because the matters herein turned, at least in part, on the issues in Gilliam , the court continued the matter for an objection to be filed and for Gilliam to be decided.
After the Objection was filed, a briefing schedule was set and, as later modified, complied with by the parties. The Gilliam decision having been rendered on March 28, 2018, after the matter was fully briefed, the court conducted a final confirmation hearing on the Plan. At that hearing on *199 May 10, 2018, the matter was taken under advisement.
The court has taken into consideration all of the foregoing, as well as the arguments of the parties at the Hearings. The court has taken judicial notice of the contents of the docket in this case. See Levine v. Egidi , Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); In re Brent , 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 1989) (Goldgar, J.) (recognizing same).
Having considered all of the foregoing, this Memorandum Decision constitutes the court's determination of the matters under advisement.
DISCUSSION
The matter before the court is one of several similar matters recently brought before the bankruptcy courts in this District, wherein counsel for chapter 13 debtors seek to manipulate the priority and payment schemes set forth in chapter 13 cases in order to ensure such counsel's payments. While not the only firm engaging in such practices, Semrad, the counsel herein, has led the way in this behavior.
In the Gilliam matter noted above, Semrad sought to alter the priority scheme in chapter 13 plans to afford Semrad payment in advance of those payments to which it would otherwise be entitled. Gilliam , 582 B.R. at 470-75. In Gilliam and fifty other cases determined by the court concurrently therewith, the court found that Semrad's changes to the priority of payments under chapter 13 plans were solely for Semrad's benefit and potentially harmful to Semrad's clients' interests. Id. As a result, and because Semrad could demonstrate neither client consent nor full disclosure to the court of this self-dealing, the court reduced Semrad's compensation and imposed rigid disclosure requirements of any similar agreements going forward. Id. at 475-77.[3]
As noted, it is not just Semrad engaging in this behavior before the undersigned. See, e.g. , In re Williams-Hayes , Case No. 17bk27961, 2018 WL 2207897, at *1-5 (Bankr. N.D. Ill. Mar. 28, 2018) (Barnes, J.). Further, it is not just the undersigned that has been required to address these issues. See, e.g. , In re Miceli , 587 B.R. 492, 495 (Bankr. N.D. Ill. 2018) (Lynch, J.) (reduced payments on secured claims); In re Carr , 584 B.R. 268, 275 (Bankr. N.D. Ill. 2018) (Thorne, J.) (same); Williams , 583 B.R. at 456-57 (same); In re Jimmar , Dkt. No. 88, Case No. 17bk11666 (Bankr. N.D. Ill. filed Apr. 13, 2017) (Hunt, J.) (unpublished) (compensation in light of altered priority).
Further, the broader question of law presented herein-reduction of payments to secured creditors under a chapter 13 plan-is also not an issue of first impression in this District, though the courts disagree on the propriety of such practice. Miceli , 587 B.R. at 502 (sustaining objection); Carr , 584 B.R. at 275 (overruling objection); Williams , 583 B.R. at 458 (sustaining objection); In re Hernandez , Case No. 08bk72148, 2009 WL 1024621, at *6 (Bankr. N.D. Ill. Apr. 14, 2009) (Barbosa, J.) (overruling objection); In re Marks , 394 B.R. 198, 201 (Bankr. N.D. Ill. 2008) (Cox, J.) (overruling objection).
In order to understand this variation and the parties' positions, it is necessary to first understand what exactly the Plan proposes.
*200 After having done so, the court will consider the Objection in full, including the standing of the Chapter 13 Trustee in this matter.
THE DEBTOR'S "STEP" PLAN
The Plan presented to the court by the Debtor is what is known locally as a step plan. Step plans are plans that set artificially low payments to secured creditors for a period of time immediately following the plan's confirmation, then stepping up those payments to a more fulsome amount later in the term of the plan. During this period, the debtor's payments to the Chapter 13 Trustee remain unchanged.
In cases such as this one, where the step is included for the counsel's benefit, the lower initial amount theoretically frees up funds to pay the debtor's counsel, which allows counsel's fees to be paid more quickly. After counsel fees are paid, the amount paid to the secured creditors increases. There are other, more legitimate, uses of step plans. For example, a debtor might seek to reduce payments to secured creditors for a period to allow multiple secured debts to be paid prior to the maturity of one or more of those debts, then step up payments after the mature debts are no longer being paid.
Disregarding the effect of the step for the moment, the Debtor's Plan requires him to pay $900.00 per month for 60 months to the Chapter 13 Trustee. Plan, at § 2.1. The Plan sets distributions from those plan payments to nonmortgage secured creditors as follows: Ally Financial in the amount of $166.00 per month for a car; and American First Financial in the amount of $20.00 per month for furniture. Plan, at § 3.3.
The step is implemented with the following nonstandard plan provisions:
1. Commencing with the 11/2018 plan payment, Ally Financial will receive set payments in the amount of $775.00 per month.
2. Ally Financial will receive pre-confirmation adequate protection payments in the amount of $166.00 per month.
3. Commencing with the 11/2018 plan payment, American First Financial will receive set payments in the amount of $104.00 per month.
Plan, at § 8.1; see also Plan, at § 1.3 (checking the "Included" box for nonstandard Plan provisions). The net effect of these provisions is that both Ally Financial and American First Financial (the "Secured Creditors") will receive reduced payments at the outset of the Plan ($166.00 and $20.00, respectively),[4] which payments will step up to higher payments in November 2018 ($775.00 and $104.00, respectively). The difference of $693.00 (the sum of the initial payments minus the sum of the subsequent payments) per month would presumably then be made available to pay Semrad's counsel fees.
In considering the Objection, the court is mindful that the burden here lies with the Debtor, as the proponent of the plan. In re Love , 957 F.2d 1350, 1354-55 (7th Cir. 1992). In Love , the Seventh Circuit was presented with a motion to dismiss under section 1307, but the parties disagreed over whether it was the movant or the debtor who bore the burden of showing that the case was commenced in good faith. Id. at 1353-55. The Seventh Circuit compared and contrasted the duties of showing good faith under sections 1307 and 1325 and in so doing observed *201 that case law with respect to section 1325 generally, see, e.g. , Hardin v. Caldwell (In re Caldwell ), 895 F.2d 1123, 1226 (6th Cir. 1990) ; Chinichian v. Campolongo (In re Chinichian ), 784 F.2d 1440, 1443 (9th Cir. 1986) ; In re McKissie, 103 B.R. 189, 191 (Bankr. N.D. Ill. 1989) (Squires, J.), and the wording of section 1325(a)(3) specifically, 11 U.S.C. § 1325(a)(3) ("has been proposed in good faith"), provide that the burden under section 1325 is on the plan proponent. Love , 957 F.2d at 1355.[5]
In furtherance of that burden, the Debtor has made legal arguments but has offered no reorganization purpose underlying the step payments. Nonetheless, neither of the Secured Creditors has objected to this treatment. The Chapter 13 Trustee has objected, however, and it is to that Objection that the court now turns.
THE CHAPTER 13 TRUSTEE'S OBJECTION
The Chapter 13 Trustee objects to the Plan on three separate grounds, as follows: (1) alleged noncompliance with section 1325(a)(5)(B)(iii) of the Bankruptcy Code ; (2) alleged lack of good faith under section 1325(a)(3) of the Bankruptcy Code ; and (3) alleged noncompliance with section 1325(a)(1) of the Bankruptcy Code.
The Chapter 13 Trustee's Objection calls into question the propriety of step plans, especially where that step exists solely for the benefit of a debtor's counsel. The court will investigate each of the Chapter 13 Trustee's arguments, in turn.
A. 11 U.S.C. § 1325(a)(5)
The Chapter 13 Trustee's first objection relies on section 1325(a)(5) of the Bankruptcy Code, one of a series of confirmation requirements set forth in section 1325(a). A chapter 13 plan may not be confirmed under this section, unless
(5) with respect to each allowed secured claim provided for by the plan-
(A) the holder of such claim has accepted the plan;
(B) ...
(iii) if-
(I) the property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and
(II) the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim *202 adequate protection during the period of the plan; or
(C) the debtor surrenders the property securing such claim to such holder
11 U.S.C. § 1325(a)(5) (emphasis added).
The purpose of section 1325(a)(5)(B)(iii)(I) is not set forth in the statute and the legislative history is silent. In re Benedicto , 587 B.R. 573, 576-77 (Bankr. S.D. Fla. 2018). In Benedicto , the court stated:
Judge Carr astutely observes that the legislative history on this particular Bankruptcy Code provision is thin. In re Cochran , 555 B.R. at 901-905. The only congressional report on the amendment to section 1325 is House Report No. 109-31(I) (the "House Report"), which was issued "to accompany [BAPCPA]." H.R. REP. NO. 109-31(I), at 1 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 88. The House Report's discussion of reforms dealing with abuse is notably silent on the issue of balloon payments to restructure mortgage debt in chapter 13 plans. The sections on "Protections for Creditors - In General" and "Protections for Secured Creditors" also say nothing about balloon payments for mortgage cures or modifications. H.R. REP. NO. 109-31(I), at 16-17 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 102-03. Judge Carr accurately notes that "the only formal legislative history" on section 1325(a)(5)(B)(iii)(I), the House Report, "merely echoes the wording of the subsection, without any insight as [to] the purpose of its enactment." In re Cochran , 555 B.R. [892, 902 (Bankr. M.D. Ga. 2016) ] ; see H.R. REP. NO. 109-31(I), at 73 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 141 ("Section 309(c)(1) amends Bankruptcy Code section 1325(a)(5)(B) to require that periodic payments pursuant to a chapter 13 plan with respect to a secured claim be made in equal monthly installments.").
Id.
Without the benefit of guidance from Congress, the court is left to consider the statute's purpose in light of its function, what one court has referred to as "educated speculation." Cochran , 555 B.R. at 901. That purpose appears, as noted above in Benedicto , to be to prevent the manipulation of payments to secured creditors without the consent of the affected creditors. Benedicto , 587 B.R. at 576 ; accord Miceli , 587 B.R. at 502 n.13 (referring to the "nearly universal line of cases which had held that the subsection prohibits balloon payments"). By requiring payments to secured creditors to be in equal monthly payments and not less than the adequate protection owed to the affected creditors, section 1325(a)(5)(B)(iii)(I) prevents debtors from ballooning payments to such creditors (delayed creditors), thereby shifting the risk of early failure of plans to be borne by the delayed creditors while diverting payments from delayed creditors to creditors of less protected status.[6]
Ballooning of payments and shifting of risk is exactly what the Debtor proposes here, however. As such, without acceptance of the Plan under section 1325(a)(5)(A), the Plan would unquestionably be unconfirmable. So, has that acceptance occurred?
*203 When investigating acceptance, one case appears to be central to most of the courts' inquiries- Andrews v. Loheit (In re Andrews ), 49 F.3d 1404, 1408 (9th Cir. 1995). In Andrews , the Ninth Circuit affirmed a bankruptcy appellate panel decision, which in turn affirmed a bankruptcy court's denial of confirmation of a chapter 13 plan. While the denial of confirmation turned on the plan's failure to provide secured creditors adequate protection under section 361, id. at 1406, the issue on appeal was whether the chapter 13 trustee had standing to pursue an objection under section 1325(a)(5) in the absence of objections from creditors. Id. at 1408. The Ninth Circuit concluded that the chapter 13 trustee had standing, but in so doing, stated in dicta that secured creditors who do not object have accepted the plan. Id. at 1409.
Andrews has become the source of a series of cases, none of which rely on its actual holding. These cases take away from Andrews two crucial points of dicta .
The first is that the absence of an objection from a secured creditor constitutes acceptance by that creditor for the purposes of section 1325(a)(5)(A). Andrews , 49 F.3d at 1409 ("Here, § 1325(a)(5) is fulfilled because subsection (A) was satisfied when the holders of the secured claims failed to object. In most instances, failure to object translates into acceptance of the plan by the secured creditor.").
The second is that an objection from a chapter 13 trustee under section 1325(a)(5) alone may be disregarded, as the treatment is personal to the affected creditors and not therefore an issue on which trustees may be heard. Id. ("[W]e find it problematic to confer standing under § 1325(a)(5)."). Andrews was recently followed in this District on both of these points. Carr , 584 B.R. at 275.
Both of those assumptions are problematic.
One problem with relying on Andrews is obvious. Neither of these two points were central to the court's ruling, which determined standing under section 1325(a)(1) for an objection as to whether the plan complied with section 361. Andrews , 49 F.3d at 1406-09. These discussions are therefore dicta and nonbinding. Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship , 526 U.S. 434, 460, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) (even Supreme Court dicta binds neither that Court nor the lower federal courts); Wilder v. Apfel, 153 F.3d 799, 803 (7th Cir. 1998) ("Dicta are the parts of an opinion that are not binding on a subsequent court, whether as a matter of stare decisis or as a matter of law of the case."). As the Seventh Circuit said in Wilder ,
They are nonbinding for two reasons. First, not being integral elements of the analysis underlying the decision-not being grounded in a concrete legal dispute and anchored by the particular facts of that dispute-they may not express the judges' most careful, focused thinking. Second, to give the inessential parts of an opinion the force of law would give judges too much power, and of an essentially legislative character; we could hardly consider ourselves judges in the Anglo-American tradition were we to interrupt this opinion to offer our thoughts, however well considered, on, say, the hearsay rule, or the Americans with Disabilities Act, or the FELA.
Id.
A second and equally obvious problem is that an opinion from outside of this Circuit is not binding. United States v. Glaser , 14 F.3d 1213, 1216 (7th Cir. 1994) ("Opinions 'bind' only within a vertical hierarchy.").
Andrews is not, therefore, controlling law on the matter. Further, Andrews is *204 unpersuasive, as described below, on each of the two central takeaways. It runs contrary to very basic principles of legal jurisprudence, the nature of the Bankruptcy Code itself and the function of trustees in bankruptcy matters. This strikes to the very heart of the matter.
1. Silence as Acceptance under 11 U.S.C. § 1325(a)(5)(A)
For those more used to reorganizations under chapter 11 of the Bankruptcy Code, chapter 13 is a strange bird. Both chapters allow debtors to effectuate plans, which are essentially enforced agreements between debtors and creditors. They achieve that result in materially different ways, however. As Judge Lynch has aptly described this:
In interpreting plans of reorganization in the context of Chapter 11 cases, the Seventh Circuit has stated that "[p]rinciples of contract law apply to interpreting a plan of reorganization." In re Airadigm Communications, Inc., 616 F.3d 642, 664 (7th Cir. 2010). This is because in Chapter 11 a "confirmed plan of reorganization is in effect a contract between the parties and the terms of the plan describe their rights and obligations." Id. See also Ernst & Young LLP v. Baker O'Neal Holdings, Inc., 304 F.3d 753, 755 (7th Cir. 2002). But it is far from clear that a Chapter 13 plan is as analogous to a contract as is a Chapter 11 plan. Unlike in Chapter 11, creditors in Chapter 13 are not entitled to vote on a plan. See 11 U.S.C. § 1126. Also, in Chapter 13 only the debtor may file a plan. 11 U.S.C. § 1321. Therefore, other than the right to object on certain specified bases in the Bankruptcy Code, a Chapter 13 plan is a rather one-sided affair.
In re Turner , 558 B.R. 269, 280 (Bankr. N.D. Ill. 2016) (Lynch, J.).
Chapter 13 was arguably intended as a simplified, cut down approach to reorganizations for individuals with less complex cases and regular income. See H.R. Rep. No. 95-595, at 116-18 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6076, 6078 (describing the need to simplify consumer reorganizations). Eliminating voting, however, in chapter 13 has forced both the Bankruptcy Code and the courts to anticipate what might otherwise be handled in the voting and confirmation process in chapter 11 and instead impose those standards. In chapter 11, for example, a unanimously accepted plan-which acceptance will be gaged based on the requirements of section 1126-might be confirmed even if it otherwise would not satisfy the so-called "absolute priority rule" embodied in section 1129(b). See, e.g. , 11 U.S.C. §§ 1129(a)(7)(A)(i), (a)(8).
Voting is not mandated by statute in chapter 13 cases and thus there is no equivalent to section 1126 in chapter 13.[7] As a result, courts are faced with a dilemma *205 when asked to determine, as they are in section 1325(a)(5)(A), whether a creditor has "accepted" a chapter 13 plan. By extension, courts are also faced with how to weigh objections in this regard, especially those of chapter 13 trustees where no creditor has objected.
In this context, many courts have concluded that silence by a secured creditor constitutes acceptance for the purpose of section 1325(a)(5)(A).
There is, of course, no question that, in the absence of any objection at all, the court may conclude that the requirements of section 1325(a)(3) have been met without the need for evidence in that regard. The Bankruptcy Rules provide as much. See Fed. R. Bankr. P. 3015(f) ("If no objection is timely filed, the court may determine that the plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues."). No such provision exists, however, within the Bankruptcy Rules with respect to section 1325(a)(1) or, by extension, section 1325(a)(5).
Nonetheless, the Andrews dicta and its progeny stand for the proposition that, in the absence of an objection, the court may conclude that a plan has been accepted. This is a very different thing.
Given how courts often handle motion practice, this conclusion is understandable even if misplaced. In American jurisprudence, the absence of an objection is often significant. In civil matters, provided that due process has been afforded, courts may conclude that the silence of affected parties equates to their acceptance. See, e.g. , Dooley v. Weil (In re Garfinkle ), 672 F.2d 1340, 1347 (11th Cir. 1982) ("Silence or acquiescence may be sufficient conduct to create an estoppel if under the circumstances there was both a duty and opportunity to speak."); cf. In re Kazi , 985 F.2d 318, 322 (7th Cir. 1993) (failure to object in light of duties under Rule 4003 foreclosed that opportunity). Andrews itself, in reaching this conclusion, relies on its own prior precedent regarding plan confirmation and preclusion, not on acceptance itself. Andrews , 49 F.3d at 1406-09 (citing to Lawrence Tractor Co. v. Gregory (In re Gregory ), 705 F.2d 1118, 1121 (9th Cir. 1983) ).
Equating lack of objections, preclusion, or waiver with acceptance is, however, wrong on a number of levels.[8]
First, voting and objections have different meanings and consequences in bankruptcy matters. Compare 11 U.S.C. § 1129(a)(9), (b) (providing specific treatment predicates to confirming a chapter 11 plan for nonaccepting creditors) with 11 U.S.C. § 1129(a)(15) (providing specific treatment predicates to confirming a chapter 11 plan as to creditors who object to the plan). In chapter 11 cases, acceptance for the purposes of voting may be deemed, see, e.g ., 11 U.S.C. § 1126(f), but such deemed acceptance does not equate to actual *206 acceptance for all purposes. See, e.g. , In re SunEdison, Inc. , 576 B.R. 453, 460-61 (Bankr. S.D.N.Y. 2017) (nonvoting creditors were not bound by the third-party release in a chapter 11 plan as affirmative acceptance was required); In re Washington Mut. Inc., 442 B.R. 314, 355 (Bankr. D. Del. 2011) ("inaction" was not a sufficient manifestation of consent to support a release). Thus, even in chapter 11, where creditors are automatically afforded both the opportunity to object to and reject a plan, their silence does not equate to affirmative acceptance of a plan. To conclude that in chapter 13, where creditors have even less of a say, that their silence is of greater effect, is more than problematic. In chapter 13, all creditors have a right to object, 11 U.S.C. § 1324(a), but only secured creditors are asked to accept. 11 U.S.C. §§ 1323(c), 1325(a)(5)(A). Objections and acceptances clearly have different scopes and different purposes.
Second, equating the failure to object to be acceptance runs contrary to the express language of the Bankruptcy Code itself. In interpreting the Bankruptcy Code, the court is required to apply principles of plain language interpretation. Ryan v. United States (In re Ryan ), 725 F.3d 623, 626 (7th Cir. 2013) ("It is the province of the legislature to choose language that maximizes its own purposes, and for the courts to give that language its plain meaning or, where it is ambiguous to interpret it in the manner most consistent with the statutory language as a whole, its purpose, and in a manner that will render it constitutional."). Those principles look to the meaning and structure of the statute itself before looking elsewhere. Here, Congress chose the term "accepted." The plain meaning of "accept," without further context, is either to make a favorable response (by an affirmative act) or to endure without protest or reaction (silence), though the definitions seem to run toward the former, not the latter.[9] As either meaning is possible, the language is ambiguous. Multiple plausible interpretations require the court to search beyond the statute's plain language. FTI Consulting, Inc. v. Merit Mgmt. Grp., LP , 830 F.3d 690, 692 (7th Cir. 2016), aff'd and remanded , --- U.S. ----, 138 S.Ct. 883, 200 L.Ed.2d 183 (2018). As a result, the court must turn to the purpose of statute and its context. Id. at 693 (relying on Food & Drug Admin. v. Brown & Williamson Tobacco Corp. , 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (courts must interpret a "statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole") (internal quotation marks and citations omitted); Davis v. Mich. Dep't of Treasury , 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") ).
Looking at the language in context, it is clear to the court that, even in chapter 13, objections and acceptances are not the same. Congress used both terms in section 1327(a), which states that "[t]he provisions of a confirmed plan bind the debtor and each creditor, ... whether or not such creditor has objected to, has accepted, or has rejected the plan." 11 U.S.C. § 1327(a). Equating acceptance with lack of objection renders section 1323(c) nearly incomprehensible. 11 U.S.C. § 1323(c)
*207 ("Any holder of a secured claim that has accepted or rejected the plan is deemed to have accepted or rejected, as the case may be, the plan as modified, unless the modification provides for a change in the rights of such holder from what such rights were under the plan before modification, and such holder changes such holder's previous acceptance or rejection."). Section 1323(c), by its very wording, shows that Congress knows the difference between actual acceptance and deemed acceptance. Congress most certainly knew how to write section 1325(a)(5)(A) to state expressly that the provision would apply in the absence of the objection, but chose instead to speak in terms of acceptance. See, e.g. , 11 U.S.C. § 327(c) ("unless there is objection by another creditor or the United States trustee"); 11 U.S.C. § 502(a) ("[a] claim or interest ... is deemed allowed unless a party in interest ... objects"); 11 U.S.C. § 1129(a)(15) (providing specific treatment requirements as predicates to confirming a chapter 11 plan as to creditors who object to the plan).
Third, placing the burden with regard to confirmation of a plan on the creditor incorrectly inverts the burdens under section 1325. As noted at the outset, the burden of showing satisfaction of the elements of section 1325 falls on the plan's proponent, in this case, the Debtor. Love , 957 F.2d at 1354-55. As the plan proponent, especially one proposing a nonstandard provision applicable only to specified creditors, the Debtor has the burden of demonstrating acceptance. Forcing a creditor to object to preserve its rights removes that burden from the Debtor. It is not unreasonable or out of the context with the overall statutory theme in chapter 13 to require a debtor to carry its burden by affirmatively seeking acceptance from creditors who a debtor is individually targeting with nonstandard provisions. Cf. Briseno v. Mut. Fed. Savs. & Loan Ass'n (In re Briseno ), 496 B.R. 509, 515 (Bankr. N.D. Ill. 2013) (Baer, J.) (plan proponent bears the burden of establishing value for lien stripping contained in chapter 13 plan); In re Zimmerman , 276 B.R. 598, 603 (Bankr. C.D. Ill. 2001) (setting out the up-front burdens that fall on a debtor as plan proponent with respect to specific lien stripping, even in advance of an objection).
Fourth and perhaps most important, equating the lack of objection to acceptance requires two logical leaps. The court must conclude that somehow preclusion and waiver equate to acceptance. The court must also conclude that the Chapter 13 Trustee's objection must be disregarded.
That former assumption collapses preclusion and waiver into that of acceptance. It is true, as noted above, that the confirmation of a plan may be preclusive on many issues. ReGen Capital I, Inc. v. UAL Corp. (In re UAL Corp. ), 635 F.3d 312, 321 (7th Cir. 2011) ("By failing to object to or appeal the plan's confirmation, [creditor] lost any opportunity to seek an exemption from or to challenge this provision.").
However, holding that the failure to object to a potentially defective plan provision equates to acceptance of that provision runs contrary to the Supreme Court's ruling in United Student Aid Funds, Inc. v. Espinosa , 559 U.S. 260, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010). In Espinosa , the Supreme Court articulated the importance of bankruptcy courts ensuring that plans are confirmed only if they comply with the Bankruptcy Code. In the context of an unobjected to plan which attempted to discharge student loan debt without demonstrating undue hardship, the Court stated that "[f]ailure to comply with this self-executing requirement should prevent confirmation of the plan even if the creditor fails to object, or to appear in the proceeding *208 at all . That is because § 1325(a) instructs a bankruptcy court to confirm a plan only if the court finds, inter alia , that the plan complies with the 'applicable provisions' of the Code." Espinosa , 559 U.S. at 276-77, 130 S.Ct. 1367 (citations omitted) (emphasis added). In light of all of the foregoing, the Supreme Court nonetheless refused to void the confirmation of the plan, finding confirmation to be preclusive. Id. at 278-79. Espinosa 's preclusive decision but stern warnings to the court of its obligation to review plans and admonition that creditors need not object to be protected by the Bankruptcy Code, makes that even where preclusion applies, the court must fulfill its obligation to ensure plan provisions are actually met. Andrews was in error when relied on preclusion to conclude that the failure to object equates to acceptance.
Espinosa is, of course, binding on this court where Andrews is not. Further, Espinosa is fifteen years more recent than Andrews , and much of the case law following Andrews has occurred in between. Nonetheless, some courts have continued to follow Andrews irrespective of the language in Espinosa . See, e.g. , Wachovia Dealer Servs. v. Jones (In re Jones ), 530 F.3d 1284, 1291 (10th Cir. 2008) ("[T]he failure to object constitutes acceptance of the plan."); Austin v. Bankowski , 519 B.R. 559, 563 (D. Mass. 2014) (mentioning Espinosa but providing no explanation of its role in following Andrews ); Scotiabank de Puerto Rico v. Lorenzo (In re Lorenzo ), Case No. 15-011, 2015 WL 4537792, at *6 (1st Cir. BAP July 24, 2015) ("[F]ailure to prosecute its objection constituted acceptance of the plan for purposes of § 1325(a)(5)(A)."); Bronitsky v. Bea (In re Bea ), 533 B.R. 283, 290 (9th Cir. BAP 2015) (rejecting Espinosa 's application to an adequate protection determination under section 1325(a)(5)(B)(iii)(II) as that provision is not self-executing); Carr , 584 B.R. at 274-75 (same); In re Olszewski , 580 B.R. 189, 193 (Bankr. D.S.C. 2017) (mentioning Espinosa but providing no explanation of its role in following Andrews ).
Several courts have broken with Andrews in light of Espinosa . See, e.g. , In re Brown , 559 B.R. 704, 708 (Bankr. N.D. Ind. 2016) ("While a creditor may 'accept' or 'agree to' plan provisions that could not otherwise be imposed upon it, the failure to object is not acceptance. If it were, the Supreme Court's comments in Espinosa would be meaningless.") (citations omitted).
Other courts have never allowed silence as acceptance in this context. In re Northrup , 141 B.R. 171, 173 (N.D. Iowa 1991) (in the context of acceptance under section 1322(a)(2), "the court agrees with the bankruptcy court that an express affirmation of consent is required"); In re Madera , 445 B.R. 509, 514 (Bankr. D.S.C. 2011) (" Section 1325 does not suggest that the absence of an objection equals confirmation, but rather supports the principle of the need for judicial supervision of the plan confirmation process."); In re Montoya , 341 B.R. 41, 46 (Bankr. D. Utah 2006) (rejecting implied acceptance under the facts of that case); In re Ferguson , 27 B.R. 672, 673 (Bankr. S.D. Ohio 1982) (rejecting chapter 13 plan for proposal contained therein to alter treatment to priority creditors without such creditors' express agreement); see also, e.g. , In re Bethoney , 384 B.R. 24 (Bankr. D. Mass. 2008) (following Montoya ); In re Montgomery , 341 B.R. 843 (Bankr. E.D. Ky. 2006) (same).
Both Bea in favor of silence as acceptance and Montoya against are instructive. In Bea , the Bankruptcy Appellate Panel for the Ninth Circuit discussed Espinosa and concluded that it did not apply to the fact driven analysis under section 1325(a)(5)(B)(iii)(II). Bea , 533 B.R. at 290.
*209 Such fact-driven analyses are not, in the panel's view, self-executing. Id. ; see also Carr , 584 B.R. at 274-75 (same). That reasoning does not, however, immediately apply to subsection (I) of section 1325(a)(5)(B)(iii). That subsection states that the property distributed under that subsection must be "in the form of periodic payments ... in equal monthly amounts." 11 U.S.C. § 1325(a)(5)(B)(iii)(I). Subsection (I) is not fact driven, but easily ascertainable from the terms of the chapter 13 plan. Further, though the legislative history of subsection (I) is lacking, on its face it appears to prevent the ballooning of secured creditor payments under a plan, exactly what the Debtor is attempting to do here and something that, as a matter of policy, the Chapter 13 Trustee should and must guard against. Espinosa , 559 U.S. at 276-77, 130 S.Ct. 1367 ; In re Escarcega , 573 B.R. 219, 234 (9th Cir. BAP 2017). Bea is not, therefore, persuasive on this issue.
In Montoya , the court found that silence may be deemed acceptance only if the plan is otherwise unobjectionable. It stated that:
It is correct that, if a plan is properly noticed and otherwise meets the requirements of § 1325(a), the Court may deem a secured creditor's silence to constitute acceptance of a plan and the plan may be confirmed. This "implied" acceptance is allowed because Chapter 13, unlike Chapter 11, has no balloting mechanism to evidence acceptance of a proposed plan, and it is only the negative-a filed objection-that evidences the lack of acceptance. When the creditor simply does nothing, the judicial doctrine of "implied" acceptance fills the drafting gap in the Code. The concept of implied acceptance of an otherwise compliant plan, or even voting on similar provisions in Chapter 11, however, is quite different from proposing a plan intentionally inconsistent with the Code and then waiting for the trap to spring on a somnolent creditor. Creditors are entitled to rely on the few unambiguous provisions of the BAPCPA for their treatment. They should not be required to scour every Chapter 13 plan to ensure that provisions of the BAPCPA specifically inapplicable to them will not be inserted in a proposed plan in the debtor's hope that the improper secured creditor treatment will become res judicata.
Montoya , 341 B.R. at 45 (footnotes omitted) (emphasis added).
The Montoya conclusion is striking under the facts at bar, where it is clear that the Debtor here has intentionally proposed a plan inconsistent with section 1325(a)(5)(B)(iii)(I) and, rather than affirmatively seek acceptance by the affected secured creditors, has lain in wait to see if the creditor objects.
Thus while silence might equal acceptance of a chapter 13 plan generally, it is difficult to find it so under the facts at bar. It is even more difficult to do so in light of the Objection from the Chapter 13 Trustee.
2. The Role of the Chapter 13 Trustee
The Bankruptcy Code as we know it today is the product of hard fought reforms in the 1970s. Prior to the enactment of the Bankruptcy Reform Act of 1978 which, when codified, became the Bankruptcy Code, the bankruptcy law of the land was primarily that contained in the Nelson Act, Bankruptcy Act of 1898, Pub. L. No. 55-541, 30 Stat. 544 (superseded by the Bankruptcy Code), as substantially amended in 1938 by the Chandler Act. Bankruptcy Act of 1938, *210 Pub. L. No. 75-696, 52 Stat. 840 (same).[10]
As detailed in the legislative history to the Bankruptcy Code, prior to the Bankruptcy Code's enactment, bankruptcy law was mired in the "horse and buggy" era and had fallen into "disrepair." H.R. Rep. No. 95-595 (1977), 1st Sess. 1977, reprinted in 1978 U.S.C.C.A.N. 5963, 5965 (the "House Report"); see also S. Rep. No. 95-989 (1978). As a result, in 1970 Congress created a commission to study and recommend changes to the bankruptcy laws. House Report, 1978 U.S.C.C.A.N. at 5963. In 1973 the commission filed its final report, id. , which found that the "most severe problem in the bankruptcy administration was the court system." Id. at 5965. The report identified two problems. First, the report noted that the "bankruptcy court ... is not truly and completely a court." It was "not independent." Id. Second, the report noted that bankruptcy judges were required to be too involved in the administration of cases, not truly acting as judges. Id. at 5965-66.
As most are aware, the Bankruptcy Code addressed the former of these two problems by attempting to give "the bankruptcy court the independence it needs to operate in today's complex bankruptcy world." Id. at 5965. While that effort was successful in many respects, in large part it failed. In the past ten years, bankruptcy court authority has been repeatedly and severely eroded by Supreme Court and other jurisprudence. See, e.g. , Stern , 564 U.S. at 464, 131 S.Ct. 2594 (holding that the Bankruptcy Code unconstitutionally vested authority in the bankruptcy courts). Such is the result that bankruptcy courts are no longer certain whether they can hear the simplest and most crucial matters within bankruptcy cases, such as fraudulent conveyance actions.
The Bankruptcy Code addressed the latter problem by attempting to remove the supervisory functions from the judge. House Report, 1978 U.S.C.C.A.N. at 5966. Those functions were transferred in large part to the United States Trustee's Office and the standing chapter 13 trustees. Id. The stated goal was to "involve[ ] the judge only when a dispute arises." Id. This second effort has been largely successful, but for two very important changes. First, the volume of cases heard by bankruptcy judges has risen disproportionately with the number of bankruptcy judges. In 1978, there were approximately 200 bankruptcy judges hearing approximately 227,000 cases. John E. Shepard, The 1981 Bankruptcy Court Time Study , Federal Judicial Center (1982), 33, 49-50, https://www.fjc.gov/sites/default/files/2012/1981Bank.pdf. In 2017, there are approximately 365 bankruptcy judges hearing over 1 million pending cases. U.S. Bankruptcy Courts Federal Judicial Caseload Statistics, Administrative Office of the United States Courts (March 31, 2018), http://www.uscourts.gov/statistics/table/f/federal-judicial-caseload-statistics/2018/03/31. In 2011, prior to the Stern decision, the caseload exceeded 1.5 million. Thus less than twice the number of judges are hearing four times or more cases.
The second change is that the Bankruptcy Code has become enormously more complex while efforts to create uniformity in the national bankruptcy system such as the national chapter 13 plan have been met *211 with resistance. The amount of time judges spend on consumer cases has risen dramatically while the courts above rightfully continue to stress the bankruptcy court's duty to scrutinize bankruptcy plans. See, e.g. , Espinosa , 559 U.S. at 277, 130 S.Ct. 1367 (referring to the bankruptcy courts' authority and obligation to require debtors to adhere to the Bankruptcy Code); In re Madison Hotel Assocs. , 749 F.2d 410, 425 (7th Cir. 1984) ("[T]his court has interpreted the identical 'good faith' language contained in 11 U.S.C. § 1325(a)(3) to require the bankruptcy court to review the proposed plan for accuracy and 'a fundamental fairness in dealing with one's creditors.' ") (quoting Ravenot v. Rimgale (In re Rimgale ), 669 F.2d 426, 432-33 (7th Cir. 1982) ).
As a result, the bankruptcy court has become more and more dependent on chapter 13 trustees to raise concerns and objections to chapter 13 plans. Such trustees may, by statute, "appear and be heard at any hearing that concerns ... confirmation of a plan ...." 11 U.S.C. § 1302(b). The wording of this section confers on chapter 13 trustees a right to be heard in matters such as the one at bar. It also, by phrasing the foregoing in the context of "shall," confers an affirmative duty on the trustee. Id. ; Andrews , 49 F.3d at 1408 ; see also In re Foulk , 134 B.R. 929, 931 (Bankr. D. Neb. 1991) ("The trustee must either recommend confirmation or object to confirmation . The chapter 13 standing trustee should thus review all Chapter 13 plans in detail and should file objections to confirmation and claimed exemptions where warranted.") (emphasis added).
It is against this backdrop that the Debtor asks the court to ignore the Objection under section 1325(a)(5)(B), arguing that the Chapter 13 Trustee lacks the standing to be heard on a section that appears to be personal to secured creditors' rights.
With respect to standing,
'[i]n every federal case, the party bringing the suit must establish standing to prosecute the action.' Elk Grove Unified Sch. Dist. v. Newdow , 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc. , 572 U.S. 118, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). When standing is at issue, the central inquiry is 'whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf.' Simon v. Kentucky Welfare Rights Organization , 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), quoting Warth v. Seldin , 422 U.S. 490, 498-99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (emphasis omitted).
In re Whitlock-Young , 571 B.R. 795, 803 (Bankr. N.D. Ill. 2017) (Barnes, J.).
In light of these requirements, there is little question that chapter 13 trustees have no traditional standing to be heard under section 1325(a)(5)(B). But the same would hold true for all bankruptcy matters. Chapter 13 trustees have no personal stake in the outcome of bankruptcy matters, including those under section 1325(a)(5)(B).
Instead, chapter 13 trustees have something better. They have an unfettered statutory right to be heard. They need not establish standing to be heard.
Andrews appears to miss this point when it considered standing under section 1325 and concluded that while a trustee has standing to raise a section 1325(a)(5) issue in the context of section 1325(a)(1) -the *212 provision that requires that all provisions of the Bankruptcy Code be met in chapter 13 plans-standing under section 1325(a)(5)(B) is "problematic." Andrews , 49 F.3d at 1409. This is not a question of standing at all.
To the extent that Andrews stands for the proposition that chapter 13 trustees may not be heard directly under section 1325(a)(5), it is misguided. That approach diminishes without basis the trustee's right to be heard. The Chapter 13 Trustee has the right to be heard on all matters concerning plan confirmation. 11 U.S.C. § 1302(b). That right applies whether the question is one under section 1325(a)(1), section 1325(a)(5) or otherwise.
What Andrews and the courts that express concern with a trustee's standing under section 1325(a)(5) appear to be doing is trying to find the right framework within which to consider a trustee's objection. The common element in the cases that have discounted a chapter 13 trustee's objection under section 1325(a)(5) seems to be some view that the chapter 13 trustee's role is limited under that section. Andrews, 49 F.3d at 1407 ; Carr , 584 B.R. at 275.
Nothing in the statute, however, leads to that result. Chapter 13 trustees are directed by statute to appear and be heard "at any hearing that concerns ... confirmation of a plan." 11 U.S.C. § 1302(b)(2)(B). In addition, section 1325(b) is expressly predicated on a trustee's ability to object to a plan, and nothing in Bankruptcy Rule 3015, which governs objections, states otherwise. Further, a trustee's role frequently crosses the hypothetical line drawn in these cases between general duties of a trustee and creditor-specific actions. For example, a trustee is expressly authorized by statute and by rule to file claims on behalf of all creditors. 11 U.S.C. § 501(c) ; Fed. R. Bankr. P. 3004 ; see also Yoon v. VanCleef , 498 B.R. 864, 867 (N.D. Ind. 2013) ("The provisions at issue contain no qualifications as to why or to what end the trustee may file such claims. These provisions are clear and unambiguous, and expressly permit the trustee file these claims."). Trustees also act in a representative capacity when they bring avoidance actions or objections to claims. Hope v. Acorn Fin., Inc. , 731 F.3d 1189, 1193 (11th Cir. 2013) ("The trustee, moreover, acts in a representative capacity when she seeks post-confirmation avoidance."). "[T]he primary purpose of the Chapter 13 trustee is not just to serve the interests of the unsecured creditors, but rather, to serve the interests of all creditors." Overbaugh v. Household Bank N.A. (In re Overbaugh ), 559 F.3d 125, 129-30 (2d Cir. 2009) ; Andrews, 49 F.3d at 1407 ; In re Maddox, 15 F.3d 1347, 1355 (5th Cir. 1994).
Put another way, a chapter 13 trustee is permitted to stand in the shoes of creditors-including secured creditors-provided those creditors are not standing in those shoes themselves.
As previously discussed, the bankruptcy courts are overburdened and chapter 13 trustees play a significant role in policing plan confirmations. Many times the trustee is privy to the interactions between the debtor and its creditors that the court is not. Thus, while in the absence of any objection a court might presume a creditor's silence is acceptance, in the face of a chapter 13 trustee's objection, how could it therefore possibly be inappropriate to require the debtor to carry its burden expressly? These are specifically targeted, nonstandard plan provisions. All a debtor need do is confirm the affected creditor's acquiescence and report that to the court. Cf. Fed. R. Bankr. P. 3018 (requiring acceptance of chapter 9 and chapter 11 plans to be in writing, but not providing a similar *213 requirement for chapter 13). If that cannot be obtained, all the more reason to find that section 1325(a)(5)(A) is not satisfied.
Further, when a plan provision is proposed in clear contravention of both the express language and purpose of section 1325(a)(5)(B)(iii)(I) for the sole reason to manipulate payments to parties to benefit a debtor's attorney, holding a creditor to a higher standard of actual, express acceptance is appropriate. Montoya , 341 B.R. at 46.
In light of nature of the step proposed here and the Chapter 13 Trustee's objection to the same, the Debtor has failed to carry its burden under section 1325 by failing to demonstrate actual acceptance under 1325(a)(5)(A). As a result, the Objection is well taken and confirmation of the Plan will be denied.
B. 11 U.S.C. § 1325(a)(3)
The Chapter 13 Trustee also asserts that the Plan is not compliant with section 1325(a)(3), the good faith requirement.
"Under section 1325(a)(3), as a condition for confirmation of a chapter 13 plan, the court must find that 'the plan has been proposed in good faith and not by means forbidden by law ...." In re Tabor , 583 B.R. 155, 195 (Bankr. N.D. Ill. 2018) (Barnes, J.).
Those courts that have found the practice engaged in here permissible have focused on the factors of Andrews but not considered that a plan that satisfies the requirements of section 1325(a)(5) (governing treatment of secured claims) might nonetheless violate section 1325(a)(3) (requiring that a plan be proposed in good faith). This is incorrect, as these tests are independent. To hold that satisfaction of section 1325(a)(3) is subsumed into satisfaction of section 1325(a)(5) is to read section 1325(a)(3) out of existence. Thus irrespective of the court's conclusion under section 1325(a)(5), the Plan must meet the good faith requirement of this section.
Good faith, however, is not defined in the statute nor discussed in the legislative history.
The Seventh Circuit has stated that "[i]n determining whether a plan is filed in good faith, the court is tasked with questioning whether the debtor is 'really trying to pay the creditors to the reasonable limit of his ability or is he trying to thwart them?' " In re Schaitz , 913 F.2d 452, 453 (7th Cir. 1990) ; see also Tabor , 583 B.R. at 195. " 'Broadly speaking, the basic inquiry should be whether or not under the circumstances of the case there has been abuse of the provisions, purpose, or spirit of (Chapter 13) in the proposal.' " Rimgale , 669 F.2d at 432 (quoting Tenney v. Terry (In re Terry ), 630 F.2d 634, 635 (8th Cir. 1980) ). "[F]or purposes of determining good faith under ... section 1325(a)(3), the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." Madison Hotel , 749 F.2d at 425. That must be done on a "case-by-case basis as the courts encounter various problems in the administration of chapter 13's provisions," Rimgale , 669 F.2d at 431 (quotations omitted), and the inquiry should " 'mitigat[e] the danger of abuse.' " In re Smith , 286 F.3d 461, 466 (7th Cir. 2002) (quoting In re Young, 237 F.3d 1168, 1174 (10th Cir. 2001) ).
Factors useful for identifying good faith include (a) whether the proposed plan states the debtor's secured and unsecured debts accurately; (b) whether the proposed plan states debtor's expenses accurately; (c) if the percentage of repayment of unsecured claims is correct; (d) if inaccuracies in the plan, if any, *214 amount to an attempt to mislead the bankruptcy court; and (e) whether proposed payments indicate a fundamental fairness in dealing with one's creditors.
Tabor , 583 B.R. at 195-96 (paraphrased from Rimgale , 669 F.2d at 431 ). "These broad sets of factors ultimately merge into a generic 'totality of the circumstances' test." In re Smith , 848 F.2d 813, 818 (7th Cir. 1988) ; Tabor , 583 B.R. at 196.
The totality of the circumstances here is that the step payment in the Plan and the way that the Debtor has sought to enforce it over known creditors is not fundamentally fair. It is not in keeping with the objectives and the purposes of the Bankruptcy Code.
This is an example of what the court was concerned with in Montoya . Semrad, on behalf of its client, the Debtor, has proposed a plan that it knows or should know violates both the express provisions and intention of section 1325(a)(5)(B)(iii)(I). As per past practice, Semrad lay in wait to see if the Plan gave rise to an objection from a Secured Creditor, or, as was noted in Montoya , the Plan could catch those creditors sleeping. If an objection had occurred, by Semrad's own admission, it would have removed the provision if it could not reach an agreement with the objecting creditor. By doing so, the Debtor (or Semrad) seeks to delay payment to the Debtor's Secured Creditors without even attempting to procure those creditors' acceptance under section 1325(a)(5)(A). That delay heightens the risks borne by such delayed creditors, solely to reduce risk and accelerate payment to another creditor, Semrad.
It should also be noted that, in advising the Debtor to proceed in this manner, Semrad has prioritized its desire to be paid over the best interests of the Debtor, its client. As this court observed previously in Gilliam , provisions such as those at bar here are harmful to the client. Not only does the delay in payment under the Plan shift risk to the Debtor's delayed creditors, but it leaves unpaid longer a debt that, in the event of failure of the debtor's bankruptcy plan, because it is secured, has superior rights outside of bankruptcy. This could leave the debtor in a worse position that had it not filed for bankruptcy.[11] Further, delay in confirming a plan because of such provisions leaves open longer the possibility that a preconfirmation default may occur. As the court observed in Gilliam , "the applicable law is less flexible with respect to preconfirmation defaults than it is with respect to postconfirmation ones." Gilliam , 582 B.R. at 470.
These risks and harms are borne by the Debtor for no reason other than to prefer payment to Semrad. Id. at 464 ("[T]he additions are asserted for the benefit of the attorneys alone, not the debtors in whose plans they are contained ...."). "[T]he plan provisions themselves and any effort spent on the plan provisions by Semrad were of no benefit to the estate in question." Id. at 471.
As a result, the court simply cannot conclude that the Plan deals with the Debtor's creditors with fundamental fairness. It creates a problem with administration such as anticipated in Rimgale for no valid bankruptcy purpose.
Thus even if this Plan were to satisfy section 1325(a)(5), it is not proposed in good faith. As a result, the Objection is well taken under this ground as well and confirmation of the Plan will be denied.
*215 C. 11 U.S.C. § 1325(a)(1)
Finally, the Chapter 13 Trustee asserts that the Plan does not comply with section 1325(a)(1).
Section 1325(a)(1) requires the Plan to comply "with the provisions of this chapter and with other applicable provisions of this title." 11 U.S.C. § 1325(a)(1). The section, put plainly, is a catch all provision which ensures that chapter 13 plans comply both with the requirements laid out in chapter 13 and the rest of the Bankruptcy Code.
Because this court has concluded that the Plan violates sections 1325(a)(3) and 1325(a)(5), section 1325(a)(1) is also not satisfied. The Plan may not be confirmed.
THE DEBTOR'S RESPONSE
All but one of the arguments raised by the Debtor in the Response have been discussed above. One, however, remains open and goes to the heart of Semrad's misunderstanding of this matter.
In the Response, the Debtor argues that there is nothing wrong with the Plan's proposal because section 1326 permits claims such as those by Semrad to be paid before the claims of other creditors. Section 1326 states, in pertinent part, that some claims shall be paid "[b]efore or at the time of each payment to creditors under the plan." 11 U.S.C. § 1326(b).
While this argument is more persuasive in the context of the prioritization of payments handled in Gilliam as opposed to the step payments discussed here, it is ultimately unpersuasive in both contexts. As Judge Lynch pointed out in Miceli , there is no conflict between sections 1325(a)(5)(B) and 1326(b). Miceli , 587 B.R. at 497-98. Section 1326(b)'s optionality does not override the requirements of section 1326(a)(5)(B). In cases where there are no secured creditors, section 1326(b) allows the payments to attorneys to occur before the payments to unsecured creditors. However, when there are in fact secured creditors, stepping and therefore delaying payments to secured creditors cannot occur without the consent of the secured creditors, and thus without that consent, the payments under section 1326(b) will happen at the time of the payment to such creditors.
In either case, that is not the crux of the court's ruling today. Remember that it is the payment scheme set forth in the National Plan that Semrad is attempting to change with nonstandard plan provisions. The National Plan follows the payment structure required by the Bankruptcy Code. Does section 1326 allow for a different structure in certain circumstances? Yes, that is one of the points of allowing nonstandard plan provisions. Does the fact that one Bankruptcy Code section permits an action override the specific restraints in another? Of course not. There are uses of the timing set forth in section 1326 that do not offend section 1325(a)(5). But those that do are impermissible.
The ruling today is limited to the question of what constitutes acceptance in light of a chapter 13 trustee's objection to nonstandard plan provisions under section 1325(a)(5), where no express acceptance has been provided to meet the debtor's burden thereunder. It is also about the inherent lack of good faith in pursuing such a plan, which is a determination independent from the statutory permissibility of the proposed provisions in a vacuum.
CONCLUSION
For all of the foregoing reasons, it is the court's conclusion that the Objection is well taken. As a result and by an order entered concurrently with this Memorandum Decision, confirmation of the Debtor's Plan will be denied.
ORDER
This matter comes before the court on Trustee Marilyn O. Marshall's Objection to *216 Confirmation [Dkt. No. 37] (the "Objection") brought by the chapter 13 trustee in opposition to an amended Chapter 13 Plan dated February 13, 2018 [Dkt. No. 31] (the "Plan") presented by Larry Shelton, the debtor in the above-captioned case. The court, having jurisdiction over the subject matter, all necessary parties appearing at the confirmation hearings that took place, including the final hearing on May 10, 2018 where the matter was taken under advisement; the court having considered the arguments of all parties in their filings and at the hearings; and in accordance with the Memorandum Decision of the court in this matter issued concurrently herewith wherein the court found that the Objection was well taken,
NOW, THEREFORE, IT IS HEREBY ORDERED:
The Objection is SUSTAINED. Confirmation of the Plan is DENIED.

The National Plan was promulgated by the Judicial Conference of the United States, effective December 1, 2017, applicable to cases filed on or after that date. Pursuant to Rule 3015.1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), judicial districts each have the authority to adopt in lieu of the National Plan a local plan, so long as that local plan complies with the requirements of the Bankruptcy Code and Bankruptcy Rules. The Northern District of Illinois did not adopt a local plan and this case was commenced on December 1, 2017. As such, the National Plan applies in this case.

Also on December 7, 2017, the Debtor filed four amended plans [Dkt. Nos. 15-18], an amended plan docketed in error [Dkt. No. 20] and a Chapter 13 Plan/Modified Plan "Redocketed to Send Notice" [Dkt. No. 21]. With respect to the matter before the court, each of these appears to be the same as the Original Plan.

In Gilliam , the court expressly reserved judgment on whether the nonstandard plan provisions were permissible components of chapter 13 plans, determining instead the practice's impropriety solely in the context of the self-serving nature of the changes and client and court disclosure regarding compensation. Gilliam , 582 B.R. at 464, n.3.

Ally Financial's postconfirmation, pre-step payment is equal to its preconfirmation adequate protection payments. Thus the Plan proposed to pay only adequate protection to Ally Financial at the outset and nothing on Ally Financial's underlying claim.

While Love 's determination was that the burden under section 1307 differs from the one under section 1325, the discussion in Love accurately reflects the state of the law here in the Seventh Circuit as to burdens under section 1325. In re Edmonds , 444 B.R. 898, 902 (Bankr. E.D. Wis. 2010) ("The burden of proof is upon the debtors, as the plan proponents, to prove all of the elements of a confirmable plan."); In re Jongsma , 402 B.R. 858, 871 (Bankr. N.D. Ind. 2009) ("[T]he debtor bears the ultimate burden of proof as to satisfaction of the confirmation criteria of 11 U.S.C. § 1325(a)."); In re Brown , 332 B.R. 562, 564 (Bankr. N.D. Ill. 2005) (Hollis, J.) ("As the plan proponent, the Trustee bears the burden to prove the conditions for confirmation of the modified plan over Brown's objection."); In re Famisaran , 224 B.R. 886, 892 (Bankr. N.D. Ill. 1998) (Squires, J.) ("The Debtors have the burden of proof and persuasion for confirmation of their Chapter 13 plan under the statutory requirements of 11 U.S.C. §§ 1325 and 1326."). But see In re Colon , 561 B.R. 682, 686 (Bankr. N.D. Ill. 2016) (Thorne, J.) (citing Love 's conclusion under section 1307 as controlling under section 1325, despite Love 's analysis to the contrary); see also In re Hill , 585 B.R. 520, 526 (Bankr. N.D. Ill. 2018) (Schmetterer, J.) (same, relying on Colon ).

Some courts have read this section differently to mean that it requires debtors to make the same monthly payment under the plan for the life of the plan. See In re Erwin , 376 B.R. 897, 902 (Bankr. C.D. Ill. 2007). Such a reading defies the plain meaning of "distributions" in the section. This court agrees with Judge Lynch in Miceli that such a reading is "strained." Miceli , 587 B.R. at 499. As neither party has addressed this reading of the statute, the court need not consider it here.

Bankruptcy Rule 3018, which governs voting in chapter 9 and chapter 11 cases, was originally intended to also provide guidance in chapter 13 cases. See 1983 Committee Advisory Note to Fed. R. Bankr. P. 3018 ("This rule applies in chapter 9, 11 and 13 cases under the Code. The references in the rule to equity security holders will not, however, be relevant in chapter 9 or 13 cases. The rule will be of little utility in a chapter 13 case because only secured creditors may be requested to vote on a plan; unsecured creditors are not entitled to vote; see § 1325(a)(4), (5) of the Code."). Though Rule 3018, by amendment, removed reference to chapter 13 in its title in 1993, there appears to have been no statutory amendment precipitating that change to the Rule. Nonetheless, some treatises still speak to voting in chapter 13 cases by secured creditors. See, e.g., Keith M. Lundin, LUNDIN ON CHAPTER 13, §§ 74.3, 74.4, https://www.lundinonchapter13.com/Home/DisplaySectionContent?sectionNumber=74.3 [& 74.4].

Not included in this analysis is the fact that equating silence with acceptance also runs contrary to one of the most basic precepts of contract law, that absent special circumstances, silence does not equal acceptance. Restatement (Second) of Contracts § 69 (1981) ; see also In re Harvey , 213 F.3d 318, 320 (7th Cir. 2000) ("[B]ankruptcy plans are to be treated as contracts and interpreted under state law ...."); In re Kimball Hill, Inc. , 565 B.R. 878, 888 (Bankr. N.D. Ill. 2017) (Barnes, J.) (same); see also First Nat. Bank of Chicago v. Atl. Tele-Network Co. , 946 F.2d 516, 519 (7th Cir. 1991) ("The law ordinarily treats silence as rejection, not acceptance, of an offer ...."). Bankruptcy plans are, after all, contracts.
Because bankruptcy plans, though interpreted under contract law, are first formed under the requirements of the Bankruptcy Code itself, it is not necessary to consider here how a contractual analysis might play out.

Accept , Black's Law Dictionary (3d ed. 1933) ("Means something more than to receive, meaning to adopt, to agree to carry out provisions, to keep and retain."); Accept , Ballentine's Law Dictionary (3d ed. 1969) ("To receive with the intent to retain; to give assent.").

An astute observer will note that, combined with the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (as codified, the Bankruptcy Code), the bankruptcy laws of this country have been substantively rewritten every 40 years. Disregarding the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Pub. L. No. 109-8, 119 Stat. 23 (which did more to require such an overhaul than avert it), the last major overhaul was 40 years ago this November.

These initial, small payments to a delayed creditor may be less than the prepetition contract payments for the debt. Therefore, if the debtor's case is dismissed before a time in which the payments to the delayed creditor "catch up" to the prepetition contract payments, the debtor is automatically in default under the terms of the contract to the delayed creditor even if the debtor had been current with the terms of the bankruptcy plan.